(No. 33034.—

THE COUNTY OF COOK, Appellee, *vs.* LIZZIE HOLLAND *et al.,* Appellants.

*Opinion filed May 24, 1954.*

FRANCIS X. CUISINIER, of Chicago, for appellants.

JOHN GUTKNECHT, State's Attorney, of Chicago, (GORDON NASH, VINCENT P. FLOOD, and DAVID L. LEEDS, of counsel,) for appellee.

Mr. JUSTICE FULTON delivered the opinion of the court:

On March 29, 1952, the county of Cook filed its petition in the circuit court of Cook County to condemn certain property located in the village of Hillside. A cross petition was filed alleging that appellants were the owners of the property sought to be taken; that said property was a part of a whole tract consisting of a quarter quarter section and that the taking of the part sought to be condemned would damage the remainder of the tract. The cause was tried before a jury, which had been permitted to view the premises, and a verdict was returned fixing the compensation to be paid by petitioner to the owners and persons interested for the land taken at $1834 and finding that there was no damage to the remainder. Judgment was entered upon the verdict, whereupon the defendants-appellants, following an unsuccessful application for a new trial, have taken this appeal.

The defendants have enumerated seven errors relied upon for reversal and new trial; however, the points and authorities raised by them do not correspond in number or form to the errors relied upon. The points and authorities set forth rules of law supported by citations which

apparently pinpoint the defendants' grounds for reversal and which in general support the statement of errors. This court will endeavor to evaluate all the evidence, giving special attention to the arguments made by the defendants with the hope of doing complete justice to this appeal as presented.

The first contention made by defendants is that in eminent domain proceedings the burden is on the petitioner to prove just compensation. In this connection it becomes necessary to review the testimony presented by the petitioner, the county of Cook. Petitioner offered four witnesses, the first of whom was the head of the Land Procurement Division of the Department of Highways for Cook County. His duties entailed assisting in the location of highways in Cook County and the supervision of the preparation of plats showing the right of way to be acquired. He testified as to the route to be taken through Cook County by the proposed Congress Street Expressway from its point of origin at Michigan Avenue and Congress Street in Chicago westerly to the Cook County line. He further testified that he was familiar with the subject property which lay within the proposed right of way, and pointed out its boundaries on a blueprint admitted in evidence as petitioner's exhibit 1. The blueprint showed that the property was almost triangular in shape with its base situated along the north side of Harrison Street for a distance of 650 feet, and consisted of 1.223 acres.

The next three witnesses offered by the petitioner were real-estate brokers with appraisal experience. One did business in the village of Hillside and two in the city of Chicago. All of them testified that they were familiar with the property sought to be taken and that it was a part of a 40-acre tract, being situated in the southwest corner thereof. Their testimony showed that the 40 acres had been used as a golf course, but had been abandoned as

such for some five years. The subject property, the 1.223 acres, is vacant except for certain public improvements consisting of a water main on the north side of Harrison Street, a sewer on the south edge of Harrison Street, a fire hydrant in front of the property and electric lines overhead. There are no sidewalks. The remainder of the 40 acres is vacant except for a part stucco and part frame residence located near the eastern edge and a couple of barns and some old buildings which had been used by the golf club. Part of the property is wooded, much of it is grown up with underbrush and from a portion of it the top soil had been removed for commercial purposes. The 40 acres is bounded on the south by Harrison Street, on the east by a large stone quarry which had been in existence for a number of years, on the north by vacant property and on the west by a section line. Proceeding westerly from the section line on the north side of Harrison Street to Wolf Road, a distance of approximately a quarter of a mile, there is vacant property. At the intersection of Wolf Road and Harrison Street is located a public school, the village hall and fire station. Going easterly from Wolf Road on the south side of Harrison Street is the Hillside Golf Course, then some vacant property and then some greenhouses, barns and a residence. Southerly from defendants' property is a small residential section containing approximately 55 houses. Immediately east of the 40 acres on the north side of Harrison Street are two old frame residences, and in back of them is the quarry belonging to the Consumers Company. North of the quarry and northeasterly of defendants' property is the Aluminum Company of America plant facing on Mannheim Road. North and west is an intensively built up residential area containing about 183 single-family homes and others under construction. There is a Catholic school and church about a half mile to a mile away. Transportation on either the Chicago, Aurora & Elgin Railway or the C.T.A. bus line

is about three quarters of a mile away. The nearest shopping center is located in Bellwood three quarters of a mile to a mile to the east. All of the witnesses were familiar with the sale of 30 acres of vacant land about a mile west of the subject property which occurred in December of 1951. That land contained similar public improvements and was considered to be best suited for residential purposes. The sales price was $1000 per acre. Based upon their experience in the real-estate business, their familiarity with the subject property and many of the factors herein set forth, these witnesses testified that in their opinion the highest and best use on March 29, 1952, of the land sought to be condemned was residential, and that the fair cash market value therefor on said date was $1834, $1345 and $1528.75, respectively. This was all the testimony offered on behalf of the petitioner.

On cross-examination the first real-estate expert testified that he could not tell whether or not any part of the quarry was located in the 40-acre tract; that below the surface of the land is dirt; that in valuing the property in question he considered the factor of the quarry land being immediately adjacent, but he did not know if any of the 40 acres is being quarried presently or ever has been quarried. The second real-estate witness on cross-examination stated that he did not know if the eastern boundary of the 40 acres included any part of the quarry, that he did not know what was below the surface of the land and that he made no tests to determine what was beneath the surface. He further stated that he had in his experience appraised quarry property. The third witness stated that the quarry was not part of the 40 acres and that he had never appraised quarry property.

It is undoubtedly the rule in this State that the petitioner has the burden of proving the fair cash value of the property to be taken, as is stated in the cases cited by defendants. (*Department of Public Works and Buildings*

v. *Bohne,* 415 Ill. 253; *Illinois Power and Light Corp.* v. *Talbott,* 321 Ill. 538; *Mauvaisterre Drainage and Levee Dist.* v. *Wabash Railway Co.* 299 Ill. 299; *Chicago, Burlington and Quincy Railroad Co.* v. *Reisch & Bros.* 247 Ill. 350.) None of these cases, however, bears any factual similarity to this case. In the *Bohne case* and in the *Reisch case,* the verdicts fixing compensation were reversed because the petitioner failed to sustain the burden of proving the value of certain leasehold interests included in the property sought to be condemned. In the *Talbott case* the verdict was reversed on an appeal brought by the petitioner on the ground that the landowner failed to prove by competent evidence the damage to the land not taken. The verdict was reversed in the *Wabash Railway Co. case* because the witnesses offered on behalf of the petitioner had no knowledge of the values of land for railway purposes and were therefore incompetent to give an opinion.

Nor do any of these cases lend support to defendants' argument. It is argued by them that since none of the petitioner's real-estate experts realized that 8½ acres along the easterly edge of the 40-acre tract had in fact been leased and operated as a quarry, their opinions were not worthy of consideration. This argument is apparently based upon the proposition that the petitioner is compelled to assume defendants' theory that the highest and best use of the land sought to be taken is for quarry purposes. It has long been the rule that parties to a condemnation proceeding have the right to adopt their own theory as to the highest and best use of the land taken and each may introduce evidence without being bound by the theory of the other. (*Union Electric Power Co.* v. *Sauget,* 1 Ill. 2d 125.) It is not contended that any portion of the 1.223 acres was leased for quarry purposes. No other land was described in the petition and the petitioner was not required to introduce evidence as to any other land. (*Illinois Power and Light Corp.* v. *Tal-*

*bott,* 321 Ill. 538.) It should be noted that all of these witnesses were aware of the existence and proximity of the quarry when they gave their opinions. The fact that they did not know what was beneath the surface of the land or made no tests to determine what was below the surface, or that they did not know that some of the 40 acres had been leased for quarry purposes, would only tend to affect the weight of their testimony. These things were brought out úpon cross-examination and the foundation was then laid for defendants to introduce their own evidence as to value based upon their own theory. We believe the petitioner sustained the burden of proof as required by law.

The defendants next argue that in determining the value of land, all elements must be considered, including anything of value below the surface, and in support of that statement they extract one sentence from the opinion in *Forest Preserve Dist.* v. *Caraher,* 299 Ill. 11, which states: "The rule is that compensation must be estimated for the land as land, with all its capabilities, and if there is timber on it, or coal, oil or other minerals under the surface, they are to be considered so far as they affect the value of the land, but they cannot be valued separately." To give meaning to that sentence it must be considered in the context in which it is used. In that case the owner-appellees took the position that the most profitable use of the land was for subdivision into lots. The petitioner contended that the land was best suited for farm and pasture purposes. The appellees there offered the testimony of a professional forester as to the market value of the timber standing on the land without evidence as to the value of the land itself. This court then made the statement above quoted. The opinion went on to say, "If the land has upon it anything which materially adds to its market value, the owner has a right to show its character and to what extent it enhances market value." That case puts

the burden squarely upon the property owner to prove any element which he feels materially increases the value of his property. It cannot be said that the petitioner has failed to sustain its burden because it has not put sufficient emphasis on an element of value the property owners believe should be stressed. In condemnation proceedings it is usually expected that widely divergent opinions as to value will be offered, since the petitioner and the property owner commonly take opposite attitudes as to the highest and best use of the land sought to be taken. In this case the defendants have offered no testimony as to highest and best use or as to value, and again they are claiming that the values placed upon the property by petitioner's witnesses are unfair because the petitioner has failed to adopt their theory.

The other case cited by defendants in support of this point is *Sanitary District* v. *Loughran,* 160 Ill. 362. In that case petitioner offered evidence that the best use to which the land could be appropriated was grazing or farm land, whereas the respondent's witnesses were of the opinion that limestone could be profitably quarried therefrom, and they based their values accordingly. That case in no way adds to the stature of defendants' argument that petitioner must prove the value of elements lying beneath the surface of the land. No argument is there made as to the sufficiency of the petitioner's proof, but the respondents undertook independently to prove the existence of merchantable limestone which enhanced the market value of their property.

It is next urged that since the judge said he wanted to get more money for the defendants, the court considered the petitioner's appraisals too low, and therefore a verdict based on the figures submitted by petitioner would be inadequate and not the equivalent in cash for the property taken. This instruction is quoted from *Phillips* v. *Town of Scales Mound,* 195 Ill. 353; "Just compensation

means the payment of such sum of money as will make the defendant whole, so that, on receipt by the defendant of the compensation and damages awarded, he will not be poorer by reason of his property being taken or damaged." While this may be an accurate statement of the law, the remarks of the trial judge will not supplant the requirement that a verdict be supported by the evidence.

The argument next advanced is that anyone familiar with condemned property is qualified to give his opinion of its value and its highest and best use, and that the court therefore erred in preventing witnesses for the defendants from giving such opinions. This presents the most serious point raised in this appeal and requires our examination of the testimony offered by defendants. The first witness was John Holland, Jr., who is one of the owners of the 40 acres. Through him it was educed that the easterly 8½ acres of the quarter section were leased to the Consumers Company for quarrying purposes, and the lease bearing date of June 1, 1950, was offered in evidence. It showed that 8½ acres located in the east one-half of the 40 acres in question were the subject matter of the lease and recited that stone had been quarried therefrom and removed to a depth of 160 feet. This witness was never asked his opinion as to the highest and best use of the land sought to be taken or the fair cash market value therefor.

J. Harlen Bretz, a geologist, testified that he examined the 40 acres at the request of the defendants. At the eastern edge the unconsolidated material from the surface of the land to the bedrock varied in thickness from a few inches to six feet. He had descended to the bottom of the quarry and stated that the rock formation was essentially the same to the very bottom. He did not measure the thickness of the limestone at that time. He examined the remainder of the 40 acres by merely walking over them.

The last witness, Herbert Manahl, had been in the quarry business some 30 years, both as owner and general

superintendent. He stated he had been familiar with the subject property for about eight years, whereupon he was immediately asked, "What in your opinion was the highest and best use of the 40-acre tract that you just described on March 29, 1952." An objection was made and sustained. Following a short discussion, the court recommended that the witness describe the 40 acres and that he be qualified. The witness was then asked if he was acquainted with the values of other types of property in the general locality to which he answered, "No." He testified he examined the premises in question with reference to making an appraisal of them, the most recent examination being within the last month. No proof was offered as to what he did or what his examination disclosed. The question next propounded was, "Now taking into consideration the description of the property involved in these proceedings and the property immediately surrounding it, the knowledge that you have gained by visiting and inspecting it, and the knowledge of the quality of stone located on the condemned land and knowledge of the market for that type stone, what in your opinion was the fair market value per acre for stone bearing land on March 29, 1952?" An objection was again made and sustained. He further testified that he was not acquainted with any sales of properties similar to the one involved in this proceeding, but he was acquainted with royalty purchases. Attempt was made to ask the witness if he was familiar with the fair cash market value of quarry property in the locality, and further objections were upheld. The attorney for the defendants then stated he could not go any further. A recess was taken and a discussion ensued in chambers which is not reported in the record. Following this conference the attorney for the defendants left the courtroom with the witness, who had never been submitted for cross-examination. At the close of the evidence the court submitted the case to the jury and charged

it orally to the effect that since there was no evidence in the record as to value except that offered by the witnesses for the petitioner, its verdict could not exceed the highest value placed upon the land by those witnesses, namely, $1834. He stated that there was no evidence of any value offered on behalf of the defendants and that there was no evidence as to any damages to the remainder of the land. The verdict hereinabove set forth resulted.

Defendants insist that the last witness called should have been permitted to state his opinions on the basis of language contained in *Department of Public Works and Buildings* v. *Bohne,* 415 Ill. 253, which reads, "* * * it is established that in condemnation proceedings the value of land is a question of fact to be proved the same as any other fact, and any person acquainted with it may testify as to its value. It is not necessary that a witness be an expert, or be engaged in the business of buying and selling the kind of property under investigation." This is admittedly the law in Illinois, but it cannot be construed to mean that a witness is qualified to state his opinion without some preliminary showing being made as to the matters upon which he bases his opinion. At the time that the witness Manahl was asked his opinion as to the highest and best use of the subject property, he had testified merely as to his experience in the quarry business and that he had known this property for about eight years. He at no time described the property or stated in what respects he was familiar with it or testified to any matters establishing a foundation for his opinion testimony. The mere fact that he had been engaged in the quarry business for a long period of time did not place him in a position in which he could state the value of the subject property without stating the reasons why he so valued it. And the fact that there was a large quarry in operation in the immediate vicinity of this property did not of itself establish the property to be condemned as useful for quarry-

ing purposes. (*Forest Preserve Dist.* v. *Caraher,* 299 Ill. 11, 15.) The matter of the qualifications of a witness in a condemnation proceeding was adequately stated in *Mauvaisterre Dist.* v. *Wabash Railway Co.* 299 Ill. 299, at page 315: "While the question of the competency of witnesses is left largely to the discretion of the trial judge, there is no presumption that a witness is competent to give an opinion, and his competency must be shown. It must appear that he has some peculiar means of forming an intelligent and correct judgment as to the value of the property in question, or the effect upon it of a particular improvement, beyond what is presumed to be possessed by men generally. [Citation.] To entitle a witness to testify to the value of a thing which is of such a nature as to have a current or market value, he must be acquainted with the value of things of the class to which the thing whose value is in question belongs." Certainly, more must be required of a witness than the categorical statement that he is familiar with the property before he will be permitted to testify as to value, and this is especially so in a case such as this where an effort is being made to prove that the land is adaptable to a special use. We do not feel that the trial judge abused his discretionary powers in sustaining the objections to this witness's testimony.

The next two arguments of the defendants are directed at the remarks made by the judge at the conclusion of the trial. While there is a statutory prohibition in this State against orally charging the jury, (section 67 of the Civil Practice Act,) no harmful error was created since the verdict was within the range of the testimony presented. Moreover, counsel for the defendants voluntarily abandoned the trial while the court was still in session, so he cannot now on appeal raise for the first time objections to the remarks of the trial judge to which no exceptions were taken at the time. (*Union Drainage Dist.* v. *Hamilton,* 390 Ill. 487.) The conduct of the counsel is also

binding upon his client. *Eggleston* v. *Royal Trust Co.* 205 Ill. 170.

The last argument presented also deals with the court's instructions, but it is such an erroneous conception of the law that it needs commenting upon. It is that the court erred in instructing the jury that the verdict had to be determined on the testimony alone and failed to tell the jury that its view of the premises and the lease should also be considered. The lease covered property other than that to be condemned and would not therefore justify a verdict over and above the valuations stated by the witnesses. There is no authority, either, that the jury's view of the premises would entitle it to return a verdict outside of the range of the values testified to by the witnesses. Defendants have cited the case of *West Chicago Park Comrs.* v. *Boal,* 232 Ill. 248, in which it is said: "* * * but they were also permitted to view the premises and observe the appearance, situation and condition of the buildings, and they were not bound to base their verdicts solely upon the testimony for petitioner. Some of the defendants did not appear or offer any evidence, but they had a right to the judgment of the jury both on the testimony and the personal view." In that case 100 lots were to be condemned containing about 300 leasehold estates. The controversy was solely concerned with the amount to be paid for the leasehold interests. The testimony as to value was widely separated, but the jury returned a verdict between the two extremes. The petitioner contended that the value as fixed by its witnesses should be accepted as to those defendants who did not appear. There was testimony offered from which the jury could fix a larger amount, and this court then made the statement quoted above. In discussing an instruction as to the credibility of witnesses testifying in a condemnation proceeding it was said in *DuPont* v. *Sanitary District,* 203 Ill. 170, "The law permits witnesses having some knowledge of values

to give their opinions as to the value of property sought to be taken. It also permits the jury, who may not have the slightest knowledge of values, to view the premises for the purpose of observing their appearance and situation, the nature and condition of improvements, and to gain any information about them that could be obtained by a view. Under this instruction the jury might disregard all the evidence of witnesses for defendant on the subject of values merely as a result of looking at the premises. The instruction was wrong."

The defendants having offered no evidence as to the value of the land, the verdict was clearly within the range of the evidence as required by law. Nor was any offer of proof made by defendants as to values their witnesses would have testified to if permitted to testify, so it would be mere speculation that their situation would be improved by a new trial. We find no harmful error in the record and no cause for which to remand this case for a new trial. The judgment of the circuit court of Cook County is, therefore, affirmed.

*Judgment affirmed.*